UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GARY PODELL, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 4:13-cv-01528 (Consolidated from C.A. No. 4:13-cv-01599) |
| v. | ) ) | CLASS ACTION |
| CRESTWOOD MIDSTREAM PARTNERS, LP, CRESTWOOD GAS SERVICES GP LLC, CRESTWOOD HOLDINGS LLC, INERGY, L.P., INERGY MIDSTREAM, L.P., NRGM GP, LLC, INTREPID MERGER SUB, LLC, ROBERT G. PHILLIPS, ALVIN BLEDSOE, TIMOTHY H. DAY, MICHAEL G. FRANCE, PHILIP D. GETTIG, VANESSA GOMEZ LAGATTA, JOEL C. LAMBERT, J. HARDY MURCHISON, and JOHN W. SOMERHALDER II, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**AMENDED CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY
AND VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiff Gary Podell ("Plaintiff"), by his attorneys, alleges upon information and belief,

except for his own acts, which are alleged on personal knowledge, as follows:

**NATURE OF THE CASE**

1.      Plaintiff brings this class action on behalf of the unitholders of partnership units

of Crestwood Midstream Partners LP ("Crestwood Midstream" or the "Partnership") against the

members of Crestwood Midstream's Board of Directors (the "Board" or the "Individual

Defendants") for their breaches of fiduciary duties arising out of their attempt to sell the

Partnership to Inergy, L.P. ("NRGY") and Inergy Midstream, L.P. ("Inergy Midstream") and its

general partner, NRGM GP, LLC (NRGY, Inergy Midstream, and NRGM GP, LLC are

collectively referred to herein as the "Buyout Group") by means of an unfair process and for an unfair price.  Plaintiff also brings claims against Defendants for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     On May 6, 2013, the Buyout Group and the Partnership announced that they had entered into a series of agreements that will culminate in the Buyout Group, through Intrepid Merger Sub, LLC ("Merger Sub"),acquiring all of the outstanding units of Crestwood Midstream in a mixed cash and unit transaction.  Crestwood Midstream unitholders will receive 1.07 common units of Inergy Midstream, L.P. for each unit of Crestwood Midstream they own and a one-time cash payment at closing of $1.03 per unit in cash (the "Merger").  Based on the closing price of Inergy Midstream, L.P. on May 3, 2013, the last trading prior to the announcement of the Merger, the implied value of the total consideration that the Partnership's unitholders will receive is approximately $27.29 per unit, or a total transaction price of approximately $1.61 billion.  The proposed consideration represents a meager 5% premium to the 20-day volume weighted average price of Crestwood Midstream units.  Also, following the closing of the Merger, Crestwood Midstream unitholders will be substantially diluted holding approximately 24.4% of the combined company.

3.     The Board has breached its fiduciary duties by agreeing to the Merger for grossly inadequate consideration.  As described in more detail below, given Crestwood Midstream's recent strong performance as well as its future growth prospects, the proposed consideration unitholders will receive is inadequate and undervalues the Partnership.  Indeed, the financial advisor of the Board's Conflicts Committee, Evercore Group ("Evercore"), conducted a *Discounted Cash Flow Analysis* that indicated a price per unit as high as $40.55.

4.     The Board also conducted an inadequate sales process.  Defendant Robert G. Phillips ("Phillips") steered negotiations towards a deal with the Buyout Group because of his expectation, and the Buyout Group's promise, of future employment with the surviving entity. In fact, Phillips will become the Chief Executive Officer ("CEO"), Chairman, and President of the combined company.  The Board acquiesced to Defendant Phillips' personal interest at the expense of the Partnership's public unitholders by permitting him to spearhead negotiations with Inergy and failing to contact one additional party.

5.     Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Merger with deal protection devices that preclude other bidders from making a successful competing offer for the Partnership.  Specifically, pursuant to the merger agreement dated May 5, 2013 (the "Merger Agreement"), Defendants agreed to: (i) a strict no-solicitation provision that requires the Partnership to terminate any ongoing discussions with other potential acquirers and from pursuing any alternatives to the Merger; (ii) a provision that provides the Buyout Group with five (5) calendar days to match any competing proposal that might arise; and (iii) a provision that requires the Partnership to pay the Buyout Group a termination fee of $50.8 million in order to enter into a transaction with a superior bidder.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Crestwood Midstream.

6.     On May 30, 2013, Inergy Midstream filed a Form S-4 Registration Statement ("Registration Statement") with the U.S. Securities and Exchange Commission ("SEC") in support of the Merger.  The Registration Statement contained the joint proxy statement of the Partnership and the Buyout Group's support of the Merger.  The Registration Statement fails to provide the Partnership's unitholders with material information or provides them with materially

misleading information thereby rendering unitholders unable to make an informed decision on whether to vote in favor of the Merger.

7.      The Individual Defendants have breached their fiduciary duties of loyalty and due care, and the Buyout Group and Merger Sub have aided and abetted such breaches by Crestwood Midstream's officers and directors.  Plaintiff seeks to enjoin the Merger unless and until Defendants cure their breaches of fiduciary duty.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

9.      The Court has personal jurisdiction over each of the Defendants because each either is organized under the laws of, conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

11.     Plaintiff is, and has been at all relevant times, the owner of units of Crestwood Midstream.

4

12.     Crestwood Midstream is a limited partnership organized and existing under the laws of the State of Delaware.  It maintains its principal executive offices at 700 Louisiana Street, Suite 2060, Houston, Texas, 77002.

13.     Defendant Crestwood Gas Services GP LLC ("Crestwood GP") is the general partner of the Partnership.  Importantly, as is common among publicly traded limited partnerships, the Partnership is managed by Crestwood GP's directors and officers.  Crestwood GP is a Delaware limited liability company.

14.     Defendant Crestwood Holdings LLC is a Delaware limited liability company. First Reserve Corporation ("First Reserve")[1] and Crestwood GP's management own 100% of Crestwood Holdings LLC.  Crestwood Holdings LLC owns 100% of Crestwood GP.

15.     Defendant Alvin Bledsoe ("Bledsoe") has been a director of Crestwood GP since 2007 and is a member of the Conflicts Committee.

16.     Defendant Timothy H. Day ("Day") has been a director of Crestwood GP since 2010.  Defendant Day is a Managing Director at First Reserve and has been with the firm since 2000.

17.     Defendant Michael G. France ("France") has been a director of Crestwood GP since 2010.  Defendant France is a Managing Director at First Reserve and has been with the firm since 2007.

18.     Defendant Philip D. Gettig ("Gettig") has been a director of Crestwood GP since 2007 and is Chairman of the Board's Conflicts Committee.

---

[1]   First Reserve owns approximately 19,681,194 Crestwood Midstream common units and 6,341,707 Class D units (convertible into Crestwood Midstream common units representing 43.29% of Crestwood Midstream's total voting power.

19.     Defendant Vanessa Gomez LaGatta ("LaGatta") has been a director of Crestwood GP since 2012.   LaGatta previously served as Vice President, Treasurer for Quicksilver Resources, Inc. and Vice President, Treasurer of Crestwood GP's predecessor, Quicksilver Gas Services GP LLC.

20.     Defendant Joel C. Lambert ("Lambert") has been a director of Crestwood GP since 2010.  Defendant Lambert is Vice President, Legal & Assistant Secretary of First Reserve and has been with the firm since 2007.

21.     Defendant J. Hardy Murchison ("Murchison") has been a director of Crestwood GP since 2010.  Defendant Murchison was a Managing Director at First Reserve from 2001 until 2011.

22.     Defendant Phillips has been Chairman of the Board, President, and CEO of Crestwood GP since 2010 and has served as Chairman, President, and CEO of Crestwood Holdings Partners, LLC.   Following the closing of the Merger, Phillips will become CEO, President and Chairman of the combined company.

23.     Defendant John W. Somerhalder, II ("Somerhalder") has been a director of Crestwood GP since 2007 and is a member of the Board's Conflicts Committee.

24.     Defendants Bledsoe, Day, France, Getting, LaGatta, Lambert, Murchison, Phillips and Somerhalder are collectively referred to herein as the "Individual Defendants" or "the Board."

25.     Defendant NRGY is a Delaware limited partnership and headquartered in Kansas City, Missouri.

26.     Defendant Inergy Midstream is a Delaware limited partnership headquartered in Kansas City, Missouri.

27.     Defendant NRGM GP, LLC is a Delaware limited liability company and the general partner of Inergy Midstream, L.P.

28.     Defendant Intrepid Merger Sub, LLC is a Delaware limited liability company and wholly-owned subsidiary of Inergy Midstream, L.P. that was created for the purposes of effectuating the Merger.

<u>**CLASS ACTION ALLEGATIONS**</u>

29.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons that own Crestwood Midstream units (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. According to the Partnership's most recent Form 10-Q, which it filed with the SEC on May 8, 2013, as of April 29, 2013, approximately 53.7 million units were represented by the Partnership as outstanding.   All members of the Class may be identified from records maintained by Crestwood Midstream or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

31.     Questions of law and fact are common to the Class, including:

(i)     Whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Merger;

7

(ii)     Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonably possible under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Merger;

(iii)    Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Partnership or its assets;

(iv)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

(v)     Whether the Buyout Group and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(vi)    Whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

32.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

33.     Plaintiff will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

34.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class, and conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially

impair or impede their ability to protect their interests.  Moreover, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### *Partnership Background and its Poise for Growth*

35.     Crestwood Midstream is the successor of Quicksilver Gas Services LP.  The Partnership owns, operates, acquires, and develops midstream energy assets.  Crestwood Midstream owns and operates predominately fee-based gathering, processing, treating and compression assets servicing natural gas producers in the Barnett Shale in north Texas, the Fayetteville Shale in northwestern Arkansas, the Granite Wash in the Texas panhandle, the Marcellus Shale in northern West Virginia, the Avalon Shale/Bone Spring in southeastern New Mexico, and the Haynesville/Bossier Shale in western Louisiana.

36.     The Partnership's 2012 fiscal year, for the year ending December 31, 2012, was successful and positioned Crestwood Midstream for near-term and long-term growth.  In a February 26, 2013 press release announcing the Partnership's fourth quarter and full-year results, Defendant Phillips stated that the Partnership was "pleased with the results" of several successful mergers and "the continued growth of our organization to strategically reposition Crestwood [Midstream] into high growth rich gas plays."

37.     Despite this transitional period, the Partnership reported strong financial results for 2012.  As described in the Partnership's 2012 Annual Report, the Partnership's 2012 revenues were $239.4 million, a significant increase compared to revenues of $205.8 million in 2011. Crestwood Midstream also reported Adjusted EBITDA of $132.4 million compared to $109.9 million from the prior year.

38.     Additionally, the Partnership expressed optimism about its near-term and long-term business prospects.  Phillips commented on Crestwood Midstream's near-term business prospects in the Partnership's February 26, 2013 press release, stating that "2013 will be another transition year but will likely deliver significant improvement over 2012" and that 2013's budget "should provide substantial earnings growth visibility in 2014 and support a quicker return to our traditional 8-10% per year distribution growth objectives[.]"

39.     Phillips also touted Crestwood Midstream's long-term business prospects in his note to unitholders, dated April 4, 2013, which was included in the Partnership's 2012 Annual Report.  Specifically, Phillips wrote:

> Looking forward, ***energy industry experts forecast that more than $200 billion of additional midstream infrastructure will be needed to support upstream unconventional asset development over the next 20-30 years***.  Having demonstrated our potential capabilities with producers, ***Crestwood [Midstream] is in excellent shape to acquire a foothold in new areas and invest in Greenfield projects to meet industry demand in those areas***.  (emphasis added.)

40.     Crestwood Midstream carried its momentum into the first quarter of 2013, for the period ended March 31, 2013.  In a May 7, 2013 press release, the Partnership reported total operating revenues of $72.4 million, a significant increase compared to $53.7 million from the same period of the prior year.  Crestwood Midstream also enjoyed Adjusted EBITDA of $38.8 million, an 8% increase compared to the fourth quarter of 2012 and 37% higher than the first quarter of 2012.  The Partnership reported that Adjusted EBITDA is on track to increase, on a quarterly basis, throughout 2013[.]"

***The Board Failed to Conduct a Market Check and Permitted Conflicted Defendant Phillips to Lead Negotiations With a Bidder That Offered Him Future Employment***

41.     The Board's decision to enter into the Merger was the product of a flawed process.  From the outset, Defendant Phillips steered negotiations towards a deal with the Buyout

Group because of his expectation of future employment with the surviving entity. The Board acquiesced to Defendant Phillips' personal interest at the expense of the Partnership's public unitholders by permitting him to spearhead negotiations with Inergy and failing to contact one additional party.

42.     NRGY and Inergy Midstream (collectively referred to herein as "Inergy") first contacted representatives of Crestwood Midstream and its affiliates in mid-January 2013 to explore potential transactions.  As John J. Sherman ("Sherman"), Inergy's Chairman, CEO, and President explained on February 12, 2013 to representatives of Crestwood Midstream and First Reserve, Inergy was looking for a partner that would, *inter alia*, "bring the management experience necessary" to help Inergy transform into a pure play midstream service provider and identify and execute on future growth opportunities.  The Partnership never contacted, nor apparently considered contacting other potential purchasers after it learned that Inergy was interested in retaining members of Crestwood Midstream's management team.

43.     After several weeks of discussions, on February 25, 2013, the Partnership indicated that it was interested in pursuing a transaction with Inergy and proposed that the Crestwood Midstream "management team would run the combined business."  Phillips proceeded to lead negotiations concerning a potential transaction and met with Sherman on March 6, 2013.

44.     Less than one week after Phillips and Sherman met to discuss a possible transaction, Inergy submitted a summary of preliminary transaction terms on March 12, 2013. Unsurprisingly, the written offer memorialized what had been discussed for weeks and provided that Defendant Phillips "would serve as Chairman, President, and Chief Executive Officer" of the combined business.

45.     Despite being conflicted by virtue of his expectation of future employment with the combined company, the Partnership's Board permitted Phillips to play a central role in negotiations with Inergy.  For instance, Phillips negotiated with Inergy representatives on March 20 and 21, 2013 about the terms of a proposed deal.

46.     Negotiations between Crestwood Midstream and Inergy continued and on April 1, 2013 representatives of both parties determined "to proceed with reciprocal due diligence." Three days later, representatives of the Partnership and Inergy met again to discuss the sequencing of the proposed transactions and a proposed timeline for "due diligence and the drafting of definitive documentation."

47.     At an April 5, 2013 Board meeting, Defendant Phillips "provided an update to the Board [] "with respect to the potential transaction with Inergy[.]"  At the same meeting, the Board determined that the Board's Conflicts Committee would be asked to evaluate the proposed merger of Crestwood and Inergy in light of "potential conflicts of interest[.]"  Importantly, the Conflicts Committee was not given permission to consider alternative transactions or contact other potential acquirers.  This notable restriction on the Conflicts Committee's authority to consider alternative transactions or contact other potential acquirers and directive to act solely with respect to the proposed transaction with Inergy was later confirmed at an April 17, 2013 Board meeting.

48.     Additionally, the timing of the Conflicts Committee's appointment ensured that it could not play a meaningful role in the "sales process" because they were appointed at such a late stage in the negotiations with Inergy.  Indeed, the Board waited to delegate authority to the Conflicts Committee until four months after the Partnership first received an indication of interest from Inergy and the parties established a due diligence timeline, commenced business

due diligence on April 11, 2013, and in the third week of April 2013, each of Inergy and Crestwood Midstream granted the other access to virtual data rooms to facilitate reciprocal due diligence.  Each of these concrete steps towards a final deal occurred before the Board confirmed the Conflicts Committee's role at the April 17, 2013 meeting, effectively affording it no opportunity to make any real contributions.

49.    To make matters worse, Defendant Phillips and other insiders largely rebuffed the Conflicts Committee when it attempted to exercise its limited power and secure more benefits for the Partnership's public unitholders.  For instance, on April 24, 2013 the Conflicts Committee requested that Crestwood management seek to improve the "economics of the proposed merger" or include a provision requiring that the Merger be approved by a "majority of the units held by the unitholders other than the Crestwood Affiliated Entities."  Phillips, acting to further his own interest by ensuring that the Merger be consummated and at the expense of the Partnership's public unitholders, discouraged the Conflicts Committee's requests "given the advanced stage of the negotiations with Inergy Midstream and Inergy Midstream's focus on ensuring deal certainty."

50.    Ultimately, the Board sold the Partnership to the Buyout Group without having any idea about the Partnership's true value because it did not contact one additional party.  Instead, the Board catered to the interests of Phillips and other insiders at the expense of Crestwood Midstream's unitholders by pursuing a deal with the Buyout Group and thus ensured Phillips' and management's future employment with the combined entity.

### *The Board Breaches Its Fiduciary Duty by Entering Into the Merger for Consideration that Undervalues the Partnership and Fails to Maximize Unitholder Value*

51.    In a press release dated May 6, 2013, the Partnership announced that it had entered into a series of transactions that would culminate in the Buyout Group acquiring all of

the outstanding Partnership units for 1.07 units of Inergy Midstream and a one-time cash payment of $1.03 per unit.  The total consideration unitholders will receive, based on the Partnership's closing unit price on May 3, 2013, which was the last trading day prior to the announcement of the Merger, would be $27.29.  Additionally, the Board failed to negotiate a "collar" to protect the consideration offered in the form of units from any sudden sharp movements in the price of Inergy's units prior to the consummation of the Merger.

52.     Given the Partnership's recent strong performance and its positioning for growth, the Merger consideration is inadequate and significantly undervalues the Partnership.

53.     The Merger provides a meager premium of just 9% based on Crestwood Midstream's closing price on May 3, 2013, the last trading day before the Merger was announced.  Also, the proposed consideration offers a paltry 5% premium to the 20-day volume weighted average price of Crestwood's common units.

54.     Further, according Eduardo Seda, an analyst at Ladenburg Thalman & Co. Inc., issued a price target for Crestwood Midstream units as high as $32.50 per unit.

55.     Additionally, the Merger will have a significant dilutive effect on the Partnership's public unitholders' interest because upon the consummation of the Merger the Partnership's public unitholders will only own approximately 24.4% of the combined company.

56.     Also, the Merger consideration fails to adequately compensate Crestwood Midstream's unitholders for the significant synergies created by the Merger.  The Partnership's May 6, 2013 press release announcing the Merger stated that the complementary "services offered by Crestwood [Midstream] and Inergy create attractive operational and financial synergies."  The same press release went on to state that the expected financial synergies will be "approximately $15 to $20 million on an annual run rate within the next 24 months."  To date, it

remains unclear, and the Registration Statement fails to clarify whether these synergies are represented in the proposed consideration being offered to Crestwood Midstream unitholders.

57.     Despite the significant synergies inherent in the transaction for the Buyout Group, the Board failed to secure a fair price for either the intrinsic value of the Partnership's assets or the value of the Partnership's assets to the Buyout Group.

58.     Moreover, while the Partnership's public unitholders will receive inadequate consideration for their units, certain officers and Board members have negotiated positions for themselves in the surviving entity.  As disclosed in the Partnership's May 6, 2013 press release, Defendant Phillips will act as "Chairman, President, and Chief executive officer of the combined company" and a May 6, 2013 Merger Overview presentation stated that "all key executives [are] expected to remain in place[.]"  Additionally, the board of the combined company will include current Crestwood Midstream Board members.

59.     Indeed, on June 16, 2013, Crestwood Midstream announced that they had completed the first steps towards the Merger through the consolidation of NRGM GP and Crestwood Midstream general partners, resulting in Defendant Phillips, the current Chairman and CEO of  Crestwood Midstream, being appointed to the additional roles of Chairman and CEO of NRGY and Inergy Midstream.

60.     Additionally, the *Discounted Cash Flow Analysis* of the Conflicts Committee's own financial advisor, Evercore, indicated a price per unit as high as $40.55.

61.     The Buyout Group is seeking to acquire the Partnership at the most opportune time, at a time when the Partnership is performing very well and is positioned for tremendous growth.

*The Preclusive Deal Protection Devices*

62.     In addition, as part of the Merger Agreement, Defendants agreed to certain deal protection devices that operate conjunctively to lock-up the Merger and ensure that no competing offers will emerge for the Partnership.

63.     Section 6.5 of the Merger Agreement includes a "no solicitation" provision barring the Partnership from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by the Buyout Group. Section 6.5(a) demands that the Partnership terminate any and all prior or on-going discussions with other potential acquirers.

64.     Pursuant to §6.5(b) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Partnership must notify the Buyout Group of the bidder's identity and the terms of the bidder's offer.  Thereafter, § 6.5(d) demands that should the Board determine to enter into a superior competing proposal, it must grant the Buyout Group five calendar days in which the Partnership must negotiate in good faith with the Buyout Group (if the Buyout Group so desires) and allow the Buyout Group to amend the terms of the Merger Agreement to make a counter-offer so that any competing proposal no longer constitutes a "Superior Proposal."

65.     In other words, the Merger Agreement gives the Buyout Group access to any rival bidder's information and allows the Buyout Group a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor the Buyout Group and piggy-back upon the due diligence of the foreclosed second bidder.

66.     The Merger Agreement also provides that Crestwood Midstream must pay the Buyout Group a $50.8 million termination fee if the Partnership decides to pursue the competing

offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the unitholders with a superior offer.

67.     Moreover, in connection with the Merger, First Reserve, who collectively owns approximately 43% of Crestwood Midstream's common units, has agreed to vote in favor of the Merger.  Accordingly, 43% of Crestwood Midstream's common units are already "locked up" in favor of the Merger.

68.     Ultimately, these preclusive deal protection provisions illegally restrain the Partnership's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Partnership.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative Merger that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

***The Materially Misleading Registration Statement***

69.     To make matters worse, on May 30, 2013 Inergy Midstream filed the Registration Statement with the SEC, which contained the joint proxy statement of the Partnership and the Buyout Group.  The Registration Statement was disseminated to the Partnership's public unitholders in an attempt to convince unitholders to vote in favor of the Merger.  The Registration Statement denies the Partnership's unitholders with certain material information concerning the financial and procedural fairness of the Merger.  Without such information Crestwood Midstream unitholders cannot make a fully informed decision about whether to vote in favor of the Merger.

***Disclosures Concerning the Partnership's and the Buyout Group's Prospective Financial Information***

70.    The Registration Statement must disclose how Inergy Midstream calculated that its capital expenditures in 2017 will be $11 million.

71.    The Registration Statement must disclose the unlevered free cash flows for Crestwood Midstream and Inergy Midstream, define "distributable cash flow," and explain how "distributable cash flow" translates to "distributed cash flow" for purposes of determining projected distributions.

72.    The Registration Statement states that Evercore reviewed the projections prepared by Crestwood Midstream and Inergy Midstream's management, "including expected synergies." The Registration Statement must disclose quantitative information concerning "expected synergies."

***Disclosures Concerning Evercore's Financial Analyses***

73.    The Registration Statement fails to disclose certain key data and inputs underlying the financial analyses relied upon by Evercore, the Conflict Committee's financial advisor, in rendering its Fairness Opinion.

74.    The Registration Statement fails to disclose various material aspects of Evercore's *Discounted Cash Flow Analysis* for Crestwood Midstream, including;

(a)    Any indication and quantification of the assumptions used in the Capital Asset Pricing Model ("CAPM") and the "total expected market return methodology[;]"

(b)    An explanation of the "total expected market return methodology" and why it was deemed to be an appropriate method for determining discount rates;

(c)    With respect to the projected cash flows approach, an indication and quantification of the assumptions used to determine a discount rate of 7.5% to 8.5%, an EBITDA multiple range of 9.0x to 11.0x, and perpetuity growth rate range of 0.5% to 1.5%;

(d)    Evercore's basis for selecting a terminal exit yield range of 7.0% to 10.0% and the source of Evercore's terminal exit yield assumptions; and

(e)    An explanation and the calculations describing how Evercore determined that the implied value range of the consideration was $23.50 to $28.00.

75.    The Registration Statement fails to disclose various material aspects of Evercore's *Precedent M&A Transaction Analysis* for Crestwood Midstream, including:

(a)    The selected transactions, including the names of the companies or entities involved, the dates, pricing multiples, target enterprise value, and operating metrics for each of the selected transactions; and

(b)    The EBITDA multiples that were examined.

76.    The Registration Statement fails to disclose various material aspects of Evercore's *Peer Group Trading Analysis* for Crestwood Midstream, including:

(a)    The objective criteria used to select the master limited partnerships ("MLP") that Evercore deemed comparable;

(b)    The "specific financial and operating data" and the pricing multiples and ratios observed for each of the selected MLPs;

(c)    Evercore's basis for selecting an EV to EBITDA multiple range of 11.5x to 13.5x for calendar year 2013, which is on the low end of the calculated MLP range of 10.2x to 18.7x;

(d)    Evercore's basis for selecting an EV to EBITDA multiple range of 9.0x to 12.0x for calendar year 2014, which is on the low end of the calculated MLP range of 8.1x to 17.2x; and

(e)    The "other considerations related to the specific characteristics" of the comparable MLPs that influenced Evercore's analysis.

77.    The Registration Statement fails to disclose various materials aspects of Evercore's *Premiums Paid Analysis* for Crestwood Midstream, including:

(a)    The objective criteria used to identify the selected transactions; and

(b)    The date, target, acquirer, target enterprise value, and premium for each of the selected transactions.

78.    The Registration Statement fails to disclose various material aspects of Evercore's *Discounted Cash Flow Analysis* for Inergy Midstream, including:

(a)    An indication and quantification of the assumptions used in the CAPM;

(b)    With respect to the projected cash flows approach, Evercore's basis for selecting a discount rate range of 6.5% to 7.5%, an EBITDA exit multiple range of 11.5x to 13.5x, and a perpetuity growth rate range of 0.5% to 1.5%;

(c)    An explanation and justification for why Evercore assumed lower discount rates and higher terminal multiples for Inergy Midstream when compared to Crestwood Midstream; and

(d)    With respect to the projected distributions approach, Evercore's definition of the "total expected market return methodology," Evercore's source for assuming an exit yield assumption range of 6.0% to 8.0% and justification of why the range is lower than that used in

the same analysis for Crestwood Midstream, and justify why Evercore used a lower cost of equity for Inergy Midstream as compared to Crestwood Midstream.

79.     The Registration Statement fails to disclose various material aspects of Evercore's *Precedent M&A Transaction Analysis* for Inergy Midstream, including:

(a)     The selected transactions, including the names of the companies or entities involved, the dates, pricing multiples, target enterprise value, and operating metrics for each of the selected transactions.

80.     The Registration Statement fails to disclose various material aspects of Evercore's *Peer Group Trading Analysis* for Inergy Midstream, including:

(a)     The objective criteria used to select the MLP's that Evercore deemed comparable;

(b)     The multiples and ratios observed for each of the selected MLPs;

(c)     The factors that went into Evercore's decision to decide that a multiple range of 14.0x to 18.0x for EV to EBITDA for calendar year 2013 and 12.0x to 16.0x for EV to EBITDA for calendar year 2014 was "relevant";

(d)     The "specific financial and operating data" observed; and

(e)     A justification for selecting multiples for Inergy Midstream that were toward the high end of the multiple range for Inergy Midstream's peers while using multiples for Crestwood Midstream that were towards the low end of the observed range for Crestwood Midstream's peers.

81.     The Registration Statement should disclose the number of price targets that Evercore examined as part of its *Wall Street Research Price Targets* for Crestwood Midstream.

82.     Furthermore, the Registration Statement should disclose the results of the financial analysis performed by the Buyout Group's financial advisor(s).

***Disclosures Concerning the Flawed Process***

83.     The Registration Statement fails to disclose why the Board did not contact one additional party to gauge whether there were other potential purchasers or help determine the intrinsic value of the Partnership.

84.     The Registration Statement must disclose: (i) why the Board permitted Phillips to spearhead negotiations even though the Buyout Group indicated as early as February 12, 2013 that it was interested in retaining Phillips and other executive officers; (ii) why it waited until April 5, 2013 to appoint the Conflicts Committee to give "Special Approval" of the Merger; and (iii) why the Board constrained the Conflicts Committee's authority to considering only the Merger as opposed to allowing them to contact additional parties and explore various other strategic alternatives.

85.     Furthermore, with respect to the Conflicts Committee, the Registration Statement should disclose when the Conflicts Committee was formed, the basis for determining the independence of each director placed on the committee, and the names of members of the Board who participated on the Conflicts Committee.

86.     The Registration Statement fails to disclose why the Board decided to retain Citigroup Global Markets Inc. ("Citi") on February 25, 2013, whether other financial advisors were considered, how the Board decided on Citi, and why Citi did not issue a fairness opinion or publish the results of its financial analyses in the Registration Statement.

87.     The Registration Statement must disclose the Crestwood Representatives that first spoke with Sherman on February 12, 2013 when he indicated that the Buyout Group was looking

for a partner that would "bring the management experience necessary" to help Inergy Midstream transform into a pure play midstream service provider and identify and execute future growth opportunities.

88.     The Registration Statement must disclose the dollar amount, cash flow multiple, and yield equivalents for each offer and counteroffer.

89.     The Registration Statement states that the one-time cash payment was designed to "prevent holders of Crestwood [Midstream] units from experiencing any dilution with respect to forecasted distributions through calendar year 2015."   However, the Registration Statement should disclose how and why the Board decided that it was important to prevent dilution only through calendar year 2015 and not beyond.

90.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Partnership unitholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class for Violations of Section 14(a)**
**of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against the Company and**
**the Individual Defendants**

91.     Plaintiff repeats all previous allegations as if set forth in full herein, excluding the Class Action Allegations set forth herein.

92.     Defendants have issued the Registration Statement with the intention of soliciting unitholder support of the Merger.

93.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

94.     Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

95.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

96.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

## COUNT II

**On Behalf of Plaintiff and the Class for Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

97.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual and on behalf of all other Crestwood Midstream unitholders.

98.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99.     The Individual Defendants acted as controlling persons of Crestwood Midstream within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Crestwood Midstream, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and

control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

100.   Each of the Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were, thus, directly involved in the making of this document.

102.   In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

103.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

104.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling

persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

### COUNT III

**On Behalf of Plaintiff and the Class Against the Individual Defendants
For Breach of Fiduciary Duties**

105.    Plaintiff repeats all previous allegations as if set forth in full herein.

106.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the unitholders of Crestwood Midstream and have acted to put their personal interests ahead of the interests of Crestwood Midstream unitholders.

107.    The Individual Defendants' recommendation of the Merger will result in change of control of the Partnership, with Partnerships' public unitholders owning only 24.4% of the surviving entity, which imposes heightened fiduciary responsibilities to maximize Crestwood Midstream's value for the benefit of the unitholders and requires enhanced scrutiny by the Court.

108.    The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the unitholders of Crestwood Midstream because, among other reasons:

(a)    they failed to take steps to maximize the value of Crestwood Midstream to its public unitholders and agree to an exchange ratio reflecting that value, and instead took steps to avoid competitive bidding;

(b)    they failed to properly value Crestwood Midstream; and

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger.

109.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Crestwood Midstream's assets and will be prevented from benefiting from a value-maximizing transaction.

110.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Merger, to the irreparable harm of the Class.

111.    Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

### On Behalf of Plaintiff and the Class Against the Individual Defendants For Breach of Fiduciary Duty -- Disclosure

112.    Plaintiff repeats all previous allegations as if set forth in full herein.

113.    The fiduciary duties of the Individual Defendants in the circumstances of the Merger require them to disclose in a non-misleading way to Plaintiff and the Class all information material to the decisions confronting Crestwood Midstream unitholders.

114.    As set forth above, the Individual Defendants have breached their fiduciary duty through materially misleading disclosures and material disclosure omissions.

115.    As a result, Plaintiff and the Class members are being harmed irreparably.

116.    Plaintiff and the Class have no adequate remedy at law.

## COUNT V

### On Behalf of Plaintiff and the Class Against The Buyout Group and Merger Sub For Aiding and Abetting the Individual Defendants' Breach of Fiduciary Duty

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The Buyout Group and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Crestwood Midstream unitholders, and have participated in such breaches of fiduciary duties.

119.    The Buyout Group and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.   In so doing, the Buyout Group and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Merger in breach of their fiduciary duties

120.    Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    Declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(B)    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Merger; unless or until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for unitholders.

(C)    In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)    Directing that Defendants to account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)      Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)      Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated:  August 2, 2013.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720
FAX (713) 227-9404

Joseph H. Weiss
Richard A. Acocelli
James E. Tullman
**WEISSLAW LLP**
1500 Broadway, 16th Floor
New York, NY  10036
Tel: (212) 682-3025
Fax: (212) 682-3010

**Attorneys for Plaintiff**